**ORIGINAL**

# 16CV3941

UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF NEW YORK

MANHATTAN DIVISION

RECEIVED
MAY 24 2016
U.S.D.C.
WP

RECEIVED
SD/NY PRO SE OFFICE
2016 MAY 23   PM 6:49

| | | |
|---|---|---|
| JP MORGAN CHASE, | * | |
| Plaintiff, | * | |
| v. | * | Civil Action No. |
| RICHARD HOLT | * | |
| Defendant | * | |
| Et al. | * | |
| | * | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

### NOTICE OF REMOVAL

The Defendant Richard Holt, "the Defendant" respectfully notify the Court, pursuant to 28 U.S.C § 1441, that he has this day removed this action from the Superior Court of the State of Connecticut for the Judicial District of Stamford/Norwalk at Stamford to this Court. In support of this removal the Defendant, submit this notice. Removal is based on 28 U.S.C § 1441, including 28 U.S.C § 1441 (c) (A) and 28 U.S.C § 1441 (c) (B) (6),  28 U.S. Code § 1446, *28 U.S.C. § 1332,* and also 12 U.S.C. 1821(d) and (e), 8 U.S. Code § 1324c,

18 U.S. Code § 1028, 42 U.S. Code § 1983, *US Constitution Article III, First and 14th Amendment,* Class Action Fairness Act of 2005, *FEDERAL COURTS JURISDICTION AND. VENUE CLARIFICATION ACT OF 2011,*

*United Student Aid Funds, Inc. v. Espinosa,* 553 F.3d 1193, 1199 (9th Cir. 2008), aff'd unanimously, 130 S. Ct. 1367 (2010). and *Tedford v. Warner-Lambert Co., 327 F.3d 423 (5th Cir. 2003), Eyak Native Village v. Exxon Corporation,* 25 F.3d 773, 779 (9th Cir. 1994), *cert. denied,* 513 U.S. 1102 (1995), legal writing at http://federalpracticemanual.org/node/14.


## BACKGROUND


1. The Plaintiff's action was commenced in the State of Connecticut Superior Court for Stamford-Norwalk at Stamford, CT, case no. FST-CV08- 5009720-S, by a complaint filed December 23, 2008. A copy of the complaint filed in Connecticut Superior Court is attached as Exhibit "A".


2. The removal is timely, citing the bad faith provision of *28 U.S. Code § 1446,* which sets no time limit , and also citing *Eyak Native Village v. Exxon Corporation, supra, Tedford v. Warner-Lambert Co., supra* and the *FEDERAL COURTS JURISDICTION AND. VENUE CLARIFICATION ACT OF 2011. In Eyak* supra it hints upon that a recent pleading demonstrating bad faith might also retoll the 30-day rule. Here such

pleading was made on February 18, 2016 and the same pleading continued

orally in a hearing on May 5, 2016, by the Defendant as pro se

in the state trial court.


       3.     The Defendant consents to the removal of this action to federal

court.


       4.     The Plaintiff's complaint purports to allege that the Plaintiff

docketed as JP Morgan Chase Bank NA, was the Payee on an alleged loan

made by Washington Mutual Bank NA, which became known

as Washington Mutual Bank and was now known as JP Morgan Chase Bank NA.

A succession that never happened, and which does not reflect true events and

was intended to obstruct the Defendant's defenses, and the Plaintiff was, and is,

continuing to be in bad faith.


       5.     This action is removable to Federal Court pursuant to

28 U.S.C 1441 and under *28 U.S. Code § 1446,* and also the bad faith provisions

therein.

6.     The plaintiff has acted in bad faith in order to prevent the defendant

from removing the action by fraudulently concealing and making false statement

concerning its relationship with the originating lender herein,

Washington Mutual FA, "WAMUFA", and Washington Mutual Bank, "WAMU "and

the Plaintiff's agreement with the Receiver of WAMU, the Federal Deposit

Insurance Corporation, FDIC, "FDIC".


7.     The true nature of that agreement was revealed in a case filed

on August 26, 2009. DEUTSCHE BANK NATIONAL TRUST COMPANY,

"DBNTC" as Trustee for the Trusts v. FEDERAL DEPOSIT INSURANCE

CORPORATION, "FDIC", et al, with JPMCB as a Co-Defendant, in the US

District Court for the District of Columbia, case no. 1:09-cv-01656-RMC, the

"DBNTC-case".


8.     Years later, in 2015, in the DBNTC-case, Judge Rosemary Collyer

relieved JPMCB in a summary judgment that JPMCB had filed against the FDIC

of any liability under JPMCB's agreement with FDIC, unless the dispute

concerned any matter that was an asset or liability on the books

of Washington Mutual on the day of its closing on September 25, 2008. Such

assets on liabilities could not have included the Defendant's loan,

as Derrell Dochow, an officer of the Office of Thrift Supervision, OTS, attested to

in his official ten page report which closed down WaMu on September 25, 2008,

that WAMU did not have any loan assets to transfer to JPMCB. Subsequently in

the bankruptcy proceedings concerning Washington Mutual's Holding Company, in the accounting of the assets of WaMu, it did not include the Defendant's loan.

9.     There would have been no reason for the Defendant's alleged loan to remain on the books of WAMUFA as an asset in 2008. The alleged loan herein was disposed of by WAMUFA in 2004/2005 after WAMUFA admitted it had filed a false foreclosure with false documents in 2002, and was caught by the State of Texas Attorney General Gregg Abbott for manufacturing foreclosures to overcome flawed and outright fraudulent loan documents. In the Defendant's matter this included a forged loan application, then a false note and a falsely sworn affidavit presented in a foreclosure. Prior to filing the foreclosure in 2002 -- should be added that the Defendant never owned any property that could be foreclosed, which was falsely indicated in the documentation --, WAMUFA, had returned and refused a number of the Defendant's payments to make it appear that the Defendant was in default. Also payments of almost $100,000 was misplaced by WAMUFA's counsel and never retrieved.

10.     Despite the overwhelming facts and direct evidence contradicting any connection between the Plaintiff and the Defendant's alleged loan, the Plaintiff has continued to claim otherwise in the State trial court.

11.     In 2013, in a case in New York, *JPMorgan Chase Bank, National Association et al v. Frederick Butler et. al,* 1686/10, SUPREME COURT OF NEW YORK, KINGS COUNTY, 2013 N.Y. Misc. LEXIS 2761; 2013 NY Slip Op 51050(U), July 5, 2013, Decided, the bubble burst, JPMCB was caught red handed that it had been falsely claimed it had acquired loans that were in reality owned by Fannie Mae, The Federal National Mortgage Association (FNMA), that were long since gone from the books of WaMu before September 25, 2008.

12.     The reason as pleadings reveal from the Deutsche Bank-case, JPMCB did so to appease Fannie Mae, which wanted to cancel all the servicing contracts involving Fannie Mae that JPMCB had acquired, worth billions, unless JPMCB cooperated in deceptively and falsely claiming that JPMCB owned the loan, in order to facilitate foreclosure, to make it seem that it was part of an acquisition from WaMu through FDIC on September 25, 2008. In actuality the loan was off the books of WaMu long before September 25, 2008. Had Fannie Mae attempted to foreclose it would reveal that the loans predated September 25, 2008, and were not under the protection under FIRREA, *12 U.S.C. 1821(d), The Financial Institutions Reform, Recovery, and Enforcement Act of 1989* (FIRREA), which JPMCB would use to preclude defenses and counter-claims by defendants in foreclosure cases hat JPMCB falsely conducted for Fannie Mae, thereby making unlawful use of a Federal statute. This also applied to loans belonging or under the control of Freddie Mac.

13.    Thus having obtained the summary judgment in the *Deutsche Bank* case supra in 2015, limiting its exposure to what was on the books of WaMu on September 25, 2008, it also had the side-effect on clearing up once and for all, that JPMCB's claim to have anything to do with the Defendant's case was false. Judge Rosemary Collyer in the Deutsche Bank stated that the summary judgment giving relief to JPMCB would have an effect on a lot of cases, including the Defendant's case herein.

14. Defendant has filed a separate complaint on May 24, 2016, in the US District Court for the Southern District, Manhattan division, against the FDIC as the Receiver of WaMu, for a declaratory ruling whether of not the Defendant's loan was on the books of WaMu on September 25, 2008, or not. This will once and for all set the record straight whether it is the FDIC as Receiver for WaMu that has the liability for the Defendant's Plaintiff's claims for breach of contract, the false foreclosures and other issues, or JPMCB.

15.    Again, the Defendant in his notice of removal cites *28 U.S. Code § 1446,* that the notice of removal must be made within 30 days of filing of the complaint, but which according to case law, *Eyak* supra, can be tolled to the latest pleading asserting the false claim. *28 U.S. Code § 1446, which* also states that were a Defendant was hindered in filing his removal by bad faith, there is no time-limit. The Defendant was hindered by JPMCB, the Plaintiff, over and over again restating the false claim that it had

somehow acquired the Defendant's loan as part of an acquisition from FDIC as Receiver of WaMu on September 25, 2008, and even as JPMCB itself prevailed in the summary judgment against the FDIC in DBNTC-case, JPMCB still continued to claim the opposite in the State trial court against the Defendant.

16.     The US District Court has some discretion under its Supplemental jurisdiction to act in the interest of judicial economy, now carried over into 28 U.S.C § 1441 (c) (B) (6), if interpreted correctly, although it slightly ambiguous. It would save considerable time if the District Court used it discretion to do so, accepting the Defendant's removal into the US District Court for the Southern District, where its complaint against the FDIC, is already pending. The Defendant had earlier asked in the State trial court to bring in WAMU and the FDIC as Receiver as a party, which the State trial court refused, although the DBNTC-case revealed that the correct party in the case would be WAMU and not JPMCB. Upon the resolution of the Defendant separate action for a declaratory ruling in the instant court has been resolved, the Defendant intends to file suit against FDIC in this court. The FDIC's preferred court is where its regional office located, within the US District Court for the Southern District Court, Manhattan Division, and also were the Counterclaim Defendant, JPMCB, has its regional headquarters. With the current complaint already pending against FDIC in the US District Court for the Southern District, all parts of the case should be joined there.

17.    The Defendant reminds the Court that alleged loan was never in default when WAMUFA commenced a false foreclosure in 2002, and that the Plaintiff caused the Defendant years of delays attempting to falsely invoke *12 U.S.C. 1821(d), The Financial Institutions Reform, Recovery, and Enforcement Act of 1989* (FIRREA). FIRREA, to bar the Defendant's defenses, despite the alleged loan never coming under those statutes since the alleged loan was never part of any acquisition of an asset from a failed bank that would have given the Plaintiff any remedy under FIRREA. Yet, JPMCB continued such false claims, by outright lies about the history and custody chain of the alleged loan.

## DIVERSITY OF CITZENSHIP JURISDICTION

18.    The case concerns Federal statutory and constitutional issues and does not require a diversity statement, even so, the Plaintiff does not reside in the same State as the Defendant and the amount in dispute is over $75,000. State court would not be a proper forum.

## FEDERAL QUESTION JURISDICTION

19.    The US Federal courts have jurisdiction over the statutes, the laws and issues herein. FIRREA, *12 U.S.C. 1821(d) and (e), The Financial Institutions Reform, Recovery, and Enforcement Act of 1989* (FIRREA), which is at the core

of the dispute, a matter of controversy that arose from the FDIC's take over of a

failed bank and the disposition of its assets, and is the exclusive domain of the

Federal Deposit Insurance Corporation, the FDIC, under US Federal courts.

## VENUE

20.     The receiving venue for removal is proper in this district

under *28 U.S.C 1441* and *1446* since both the regional office of the FDIC,

JPMCB, the counterclaim Plaintiff are located within the territory of

the UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT,

Manhattan Division.

## NOTICE

21. Concurrently with the filing of this Notice, the Defendant has filed a

copy of this Notice of Removal with the Clerk of the Superior Court for the State

of Connecticut for the Judicial District of Stamford/Norwalk at Stamford.

Dated at White Plains, New York on the 24 of May 2016.

Respectfully, for

the Defendant,

Richard Holt, pro se

By

/s/ Richard Holt

---

Richard Holt acting pro se

23 Ridgewood Road

Norwalk, CT 06853

Phone: 203-434-1455

# Exhibit "A"

FORECLOSURE MEDIATION
NOTICE TO HOMEOWNER
JD-CV-94 New 6-08
P.A. 08-176

STATE OF CONNECTICUT
SUPERIOR COURT
JUDICIAL BRANCH
www.jud.ct.gov



NOFM

## Notice to Homeowner: Availability of Foreclosure Mediation

You have been served with a foreclosure complaint that could cause you to lose your property.

A Foreclosure Mediation Program has been set up to assist homeowners.

You can use the program if:

- you are the owner-occupant of a one-to-four family residential property;

- you are the borrower;

- the mortgage on your owner-occupied residential property is being foreclosed;

- the property being foreclosed is your primary residence;

- the property is located in Connecticut; and

- the foreclosure action has a return date on or after July 1, 2008

Mediation is a process by which a neutral mediator assists parties in reaching a voluntary negotiated agreement to resolve their dispute.

To participate in the Foreclosure Mediation Program, you must complete the attached **Foreclosure Mediation Request form, JD-CV-93**, and file it with the court. You must also fill out and file an **Appearance form, JD-CL-12**, which you may get at any Judicial District courthouse or from the Judicial Branch website at www.jud.ct.gov.

Judicial Branch mediators will conduct mediation sessions at the courthouse.

**There is no application fee for this program.**

FORECLOSURE MEDIATION
REQUEST
JD-CV-93  New  6-08
P.A. 08-176

STATE OF CONNECTICUT
SUPERIOR COURT
JUDICIAL BRANCH
www.jud.ct.gov

FMREQ



**Instructions to Homeowner Applicant**

If you want to use the Foreclosure Mediation Program:

Fill out this Request form and an Appearance form,
JD-CL-12 (available at the courthouse or online at
www.jud.ct.gov), and file them with the court not more
than 15 days after the return date on the Summons.

If you were served with this Foreclosure Mediation Request
form after you were served the Summons, you may file this
Request and the Appearance form not more than 15 days after
this Foreclosure Mediation Request form was served on you.

**Type or Print Legibly**

Name of Case *(Plaintiff on Summons vs. Defendant on Summons)*

| Return Date (On upper right portion of Summons) | Judicial District at (On upper left portion of Summons) |
|---|---|

**Homeowner(s) Information**

Your Name(s)

Address *(Number, street, town, state, zip code)*

| Telephone Number ( ) | Business Phone ( ) | Cell Phone ( ) |
|---|---|---|

Is this property your primary residence? ☐ Yes ☐ No

Is it a one-to-four family residential property located in Connecticut? ☐ Yes ☐ No

Are you the borrower? ☐ Yes ☐ No

Is this a mortgage foreclosure? ☐ Yes ☐ No

> If you answered "No" to any of these questions, please do not submit this Request as you do not qualify for the Foreclosure Mediation Program.

I request foreclosure mediation in my case:

| Signed | Print Name of Person Signing | Date Signed |
|---|---|---|

I certify that a copy of this Request was mailed or delivered to all counsel and self-represented *(pro se)* parties of record on

*(Date mailed or delivered):* _____

| Signed *(Attorney or self-represented party)* | Print Name of Person Signing | Telephone Number |
|---|---|---|

Address *(Number, street, town, state, zip code)*

Name of each party served and address at which service was made *(All Plaintiffs and all other Defendants on Summons)**

| Name *(Each party served)* | Address *(Where party was served)* |
|---|---|
| | |
| | |
| | |

RETURN DATE: DECEMBER 30, 2008   :   SUPERIOR COURT

JPMORGAN CHASE BANK, NATIONAL   :   J.D. OF STAMFORD/NORWALK
ASSOCIATION

VS.   :   AT STAMFORD

HOLT, RICHARD L. A/K/A HOLT,   :   DECEMBER 12, 2008
RICHARD, ET AL

### COMPLAINT

### COUNT ONE – REFORMATION OF MORTGAGE:

  1.    On March 22, 2000, Richard L. Holt a/k/a Richard Holt owed Washington

Mutual Bank, FA which became known as Washington Mutual Bank and is now known as

JPMorgan Chase Bank, National Association $308,000.00, as evidenced by a promissory note

for said sum dated on said date, and payable to the order of Washington Mutual Bank, FA

which became known as Washington Mutual Bank and is now known as JPMorgan Chase

Bank, National Association with interest from said date, in monthly installments of principal

and interest. A true and correct copy of said Note is attached as Exhibit C.

  2.    On said date, by a deed of that date, said Richard L. Holt a/k/a Richard Holt

individually and on behalf of Dorsum Nemus Limited Liability Company a/k/a Dorsum Lemus

Limited Liability Company, to secure said note, mortgaged to Washington Mutual Bank, FA

which became known as Washington Mutual Bank and is now known as JPMorgan Chase

Bank, National Association the premises known as 23 Ridgewood Drive, Norwalk,

Connecticut, and described in Exhibit A attached hereto and made a part hereof. A true and correct copy of said Mortgage is attached as Exhibit D.

   3.      Said mortgage deed was recorded on the Norwalk Land Records on March 27, 2000 in Volume 3876 at Page 250.

   4.      By a Quit Claim Deed, dated September 16, 1996, Richard L. Holt and Lisbet M. Holt quit-claimed the fee interest in the above-referenced property to Dorsum Nemus Limited Liability Company, which Quit Claim Deed was recorded on September 17, 1996 in Volume 3257 at Page 234 of the Norwalk Land Records. A true and correct copy of said Quit-Claim Deed is attached as Exhibit B.

   5.      On or about March 22, 2000, said Dorsum Nemus Limited Liability Company resolved that said Limited Liability Company shall grant a mortgage to Washington Mutual Bank, F.A. to secure a $308,000.00 loan and that Richard Holt was authorized to execute the mortgage, promissory note and documents required in connection with the mortgage loan transaction. A true and correct copy of said Certificate of Limited Liability Company Resolution is attached as Exhibit E.

   6.      Due to a scrivener's error at the closing of said mortgage loan, the above-reference mortgage deed stated that the mortgagor was "Dorsum Lemus Limited Liability Company," instead of "Dorsum Nemus Limited Liability Company."

7.    The mortgage should be reformed to state the name of the mortgage to be "Dorsum Nemus Limited Liability Company."

**COUNT TWO:**

1-3.    Paragraphs 1 through 3, inclusive of Count One are incorporated herein and alleged as Paragraphs 1 through 3, inclusive of Count Two.

4.    The Plaintiff is the holder of said Note and Mortgage and the unpaid balance of said note is $296,828.87, plus interest from August 1, 2005, late charges and collection costs have not been paid although due and payable.

5.    Said note and mortgage are now in default by virtue of nonpayment of the installments of principal and interest due on September 1, 2005 and each and every month thereafter, and the Plaintiff has exercised its option to declare the entire balance of said note due and payable.

6.   The following encumbrances of record upon the property sought to be foreclosed are prior in right to the Plaintiff's mortgage and are not affected by this action:

(a)    Any taxes due the City of Norwalk that remain outstanding and properly perfected as of the date hereof pursuant to applicable law.

(b)    Water Lien in favor of the City of Norwalk in the original principal amount of $282.18 dated April 13, 2004 and recorded April 13, 2004 in Volume 5371 at Page

199 of the Norwalk Land Records.

(c)     Water Lien in favor of the City of Norwalk in the original principal amount of $495.78 dated April 13, 2005 and recorded August 22, 2005 in Volume 5933 at Page 218 of the Norwalk Land Records.

(d)     Water Lien in favor of the City of Norwalk in the original principal amount of $901.66 dated September 25, 2006 and recorded September 25, 2006 in Volume 6330 at Page 1 of the Norwalk Land Records.

(e)     Water Lien in favor of the City of Norwalk in the original principal amount of $1,348.41 dated November 5, 2007 and recorded November 5, 2007 in Volume 6677 at Page 315 of the Norwalk Land Records.

(f)     Water Lien in favor of the City of Norwalk in the original principal amount of $1,723.93 dated November 5, 2008 and recorded November 5, 2008 in Volume 6892 at Page 101 of the Norwalk Land Records.

7.     On the aforementioned piece of property, the following interests are claimed which are subsequent to Plaintiff's said mortgage: NONE

8.     Upon information and belief, the Defendant, Dorsum Nemus Limited Liability Company is the owner of record and in possession of said premises.

WHEREFORE, The Plaintiff claims:

**AS TO COUNT ONE:**

1.    Reformation of the Mortgage; and
2.    Such other relief and further equitable relief as may be appropriate.

**AT TO COUNT TWO:**

1.    A foreclosure of said mortgage.
2.    Immediate possession of the mortgaged premises.
3.    A deficiency judgment.  **No deficiency will be sought against any person whose obligation under the subject promissory note has been heretofore or hereafter discharged in bankruptcy.**
4.    The appointment of a receiver to collect rents and profits accruing from the premises.
5.    Reasonable attorney's fees and costs.
6.    Such other relief and further equitable relief as may be required.

**NOTICE:     A PERSON WHO IS UNEMPLOYED OR UNDER-EMPLOYED AND WHO HAS FOR A CONTINUOUS PERIOD OF AT LEAST TWO YEARS PRIOR TO THE COMMENCEMENT OF THIS FORECLOSURE ACTION OWNED AND OCCUPIED THE PROPERTY BEING FORECLOSED AS SUCH PERSON'S PRINCIPAL RESIDENCE, MAY BE ENTITLED TO CERTAIN RELIEF PROVISIONS UNDER SECTION 49-31d to 49-31i, INCLUSIVE, OF THE CONNECTICUT GENERAL STATUTES.  YOU SHOULD CONSULT AN ATTORNEY TO DETERMINE YOUR RIGHTS UNDER THIS ACT.**

**UNLESS YOU, WITHIN THIRTY DAYS AFTER RECEIPT OF THIS NOTICE, DISPUTE THE VALIDITY OF THE DEBT, OR ANY PORTION THEREOF, THE DEBT WILL BE ASSUMED TO BE VALID BY US.  IF YOU NOTIFY US IN WRITING WITHIN THE THIRTY DAY PERIOD THAT THE DEBT, OR ANY PORTION THEREOF, IS DISPUTED, WE WILL OBTAIN VERIFICATION OF THE DEBT OR A COPY OF A JUDGMENT AGAINST YOU (IF APPLICABLE) AND A COPY OF SUCH VERIFICATION OR JUDGMENT WILL BE MAILED TO YOU BY US.  ALSO, UPON YOUR WRITTEN REQUEST WITHIN THE THIRTY DAY**

**PERIOD, WE WILL PROVIDE YOU WITH THE NAME AND ADDRESS OF THE ORIGINAL CREDITOR, IF DIFFERENT FROM THE CURRENT CREDITOR.  THE FACT THAT YOU HAVE THIRTY (30) DAYS TO INDICATE A DISPUTE WILL NOT PREVENT US FROM FILING SUIT WITHIN THAT TIME.**

**THE LAW FIRM OF BENDETT & McHUGH, P.C. IS A DEBT COLLECTOR AND IS ATTEMPTING TO COLLECT A DEBT.  ANY INFORMATION WE OBTAIN WILL BE USED FOR THAT PURPOSE.   IF YOU HAVE PREVIOUSLY RECEIVED A DISCHARGE IN BANKRUPTCY, THIS CORRESPONDENCE IS NOT AND SHOULD NOT BE CONSTRUED TO BE AN ATTEMPT TO COLLECT A DEBT, BUT ONLY ENFORCEMENT OF A LIEN AGAINST PROPERTY.**

This action is within jurisdiction of the Superior Court.

Dated at Farmington, Connecticut, this 12th day of December, 2008.

THE PLAINTIFF,
JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION

By
David F. Borrino
Bendett & McHugh, P.C.
Its Attorney
160 Farmington Avenue
Farmington, CT 06032
(860) 677-2868
Juris No. 102892

— Exhibit A

ALL that certain lot of land, with the buildings thereon, situated in the City of Norwalk in the County of Fairfield and State of Connecticut, known and designated as lot number fifteen (15) on a certain map entitled "Map of Dibblecrest at Rowayton, Norwalk, Ct.," now on file in the office of the Town Clerk of said Norwalk and numbered twenty-two hundred and ninety-one (2291), reference thereto being had; said lot being bounded as follows:

| | |
|---|---|
| NORTHERLY: | 60 feet, more or less, by land now or formerly of Alfred S. Curry and Arline R. Curry; |
| EASTERLY: | 175 feet, more or less, by land now or formerly of Alice D. Nunhall and Dorothy Magyar; |
| SOUTHERLY: | 60 feet, more or less, by Ridgewood Avenue; and |
| WESTERLY: | 174 feet, more or less, by land now or formerly of Arnold B. Aspblom and Gladys E. Aspblom. |

EXHIBIT A

Exhibit B

VOL 3257 PAGE 234                    12602

# To all People to Whom these Presents shall Come, Greeting:

**Know Ye That**      *Richard L. Holt and Lisbet M. Holt of the Town of Norwalk,*
*County of Fairfield and State of Connecticut (Releasor), for the consideration of $1.00*
*received to their full satisfaction of Dorsum Nemus Limited Liability Company, a Limited*
*Liability Company, formed under the Laws of the state of Nevada (Releasee) do remise,*
*release, and forever QUITCLAIM unto the said Dorsum Nemus Limited Liability Company*
*and unto its successors and assigns forever, all the right, title, interest, claim and demand*
*whatsoever the said releasors have or ought to have in or to*

ALL that certain lot of land, with the buildings thereon, situated in the City of
Norwalk in the County of Fairfield and State of Connecticut, known and
designated as lot number fifteen (15) on a certain map entitled "Map of
Dibblecrest at Rowayton, Norwalk, Ct.," now on file in the office of the Town
Clerk of said Norwalk and numbered twenty-two hundred and ninety-one
(2291), reference thereto being had; said lot being bounded as follows:

NORTHERLY:     60 feet, more or less, by land now or formerly of Alfred S.
                   Curry and Arline R. Curry;

EASTERLY:     175 feet, more or less, by land now or formerly of Alice D.
                   Nunhall and Dorothy Magyar;

SOUTHERLY:     60 feet, more or less, by Ridgewood Avenue; and

WESTERLY:     174 feet, more or less, by land now or formerly of
                   Arnold B. Aspblom and Gladys E. Aspblom.

No    Conveyance Tax Received
Mary O. Keegan
Town Clerk of Norwalk

**To Have and to Hold** the premises, with the appurtenances thereof, unto the said
Releasee, its successors and assigns forever, so that neither the said Releasors nor their heirs
nor any other person under them, shall hereafter have any claim, right or title in or to the
premises, or any part thereof, but therefrom and they are by these presents forever barred
and excluded.

EXHIBIT B

VOL 3257 PAGE 235

*In Witness Whereof,* we have hereunto set our hand and seal this 16ᵗʰ day of September, A.D. 1996.

*Signed, Sealed and Delivered in the presence of:*

_Brian Bird Beaya_

_L R_
LARRY F. GINSBERG

_Richard L. Holt_

_Lisbet M. Holt_

**State of Connecticut** } ss.
**County of Fairfield**

On this the 16ᵗʰ day of September, 1996, before me, Larry F. Ginsberg, the undersigned officer, personally appeared Richard L. Holt and Lisbet M. Holt, known to me (or satisfactorily proven) to be the persons whose names are subscribed to the within instrument and acknowledged that they executed the same for the purposes therein contained as their free act and deed.

*In Witness Whereof,* I have hereunto set my hand and official seal.

Larry F. Ginsberg
Commissioner of the Superior Court

*Latest address of Grantee*
No. and Street _23 Ridgewood Avenue_
City _Rowayton_
State _CT_          Zip _06853_

Received for Record        September 17,   A.D. 19 96  at        4:25 P.M. and recorded by

Mary O. Keegan
Town Clerk

**Washington Mutual**    *Exhibit C*

**ADJUSTABLE RATE NOTE**
**(FHLB Index - Payment and Rate Caps)**

03-238-003596059-0

THIS NOTE CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE THAN __125%__ OF THE ORIGINAL AMOUNT (OR $ ___385,000.00___). MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THIS NOTE OR ANY RIDER TO THIS NOTE. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

| NEWTOWN | Connecticut |
|---|---|
| (City) | (State) |

March 22, 2000

23 RIDGEWOOD DRIVE, NORWALK, CT 06853
(Property Address)

**1.    BORROWER'S PROMISE TO PAY**
    In return for a loan that I have received, I promise to pay U.S. $ ___308,000.00___ plus any amounts added in accordance with Section 4 (G) below, (this amount is called "principal"), plus interest, to the order of the Lender. The Lender is ___Washington Mutual Bank, FA___. I understand that the Lender may transfer this Note. The Lender or anyone who takes this Note by transfer and who is entitled to receive payments under this Note is called the "Note Holder".

**2.    INTEREST**
    Interest will be charged on unpaid principal until the full amount has been paid. I will pay interest at a yearly rate of __4.950__%. The interest rate I will pay will change in accordance with Section 4 of this Note.
    The interest rate required by this Section 2 and Section 4 of this Note is the rate I will pay both before and after any default described in Section 7(B) of this Note.

**3.    PAYMENTS**
    **(A)  Time and Place of Payments**
    I will pay principal and interest by making payments every month. In this Note, "payments" refer to principal and interest payments only, although other charges such as taxes, insurance and/or late charges may also be payable with the monthly payment.
    I will make my monthly payments on __1st__ day of each month beginning on __May, 2000__, I will make these payments every month until I have paid all of the principal and interest and any other charges described below that I may owe under this Note. My monthly payments will be applied to interest before principal. If, on __April 1, 2030__, I still owe amounts under this Note, I will pay those amounts in full on that date, which is called the "maturity date".
    I will make my monthly payments at __9451 CORBIN AVE, NORTHRIDGE, CA 91324__ _____, or at a different place if required by the Note Holder.

    **(B)  Amount of My Initial Monthly Payments**
    Each of my monthly payments until the first Payment Change Date will be in the amount of U.S. $ __1,644.01__, unless adjusted at an earlier time under section 4(H) of this Note.

32743 (02-99)                          Page 1 of 6

*EXHIBIT C*

03-2383-003596059-0

### (C) Payment Changes

My monthly payment will be recomputed, according to Sections 4(E)(F)(G)(H) and (I) of this Note, to reflect changes in the principal balance and interest rate that I must pay. The Note Holder will determine my new interest rate and the changed amount of my monthly payment in accordance with Section 4 of this Note.

## 4.    INTEREST RATE AND MONTHLY PAYMENT CHANGES

### (A) Interest Rate Change Dates

The   interest   rate   I   will   pay   may   further   change   on   the   <u>1st</u>   day   of <u>May, 2000</u>, and on that day every month thereafter. Each date on which my interest rate could change is called a "Change Date".

### (B) The Index

Beginning with the first Change Date, my interest rate will be based on an Index. The "Index" is the monthly weighted average cost of funds for Eleventh District savings institutions as announced by the Federal Home Loan Bank of San Francisco (the "11th District Monthly Weighted Average Cost of Funds Index"). The most recent Index figure available on each interest rate Change Date is called the "Current Index".

Information on the 11th District Monthly Weighted Average Cost of Funds Index may be obtained by writing to the Federal Home Loan Bank at P.O. Box 7948, San Francisco, California 94120, Attention: Public Information Department; or by calling the Federal Home Loan Bank at 1-415-616-2600.

If the Index is no longer available, the Note Holder will use the new Index as if it were the Index. The new Index will be the Twelve-Month Average, determined as set forth below, of the annual yields on actively traded United States Treasury Securities adjusted to a constant maturity of one year as published by the Federal Reserve Board in the Federal Reserve Statistical Release entitled "Selected Interest Rates (G.13)" (the "Monthly Yields"). The Twelve-Month Average is determined by adding together the Monthly Yields for the most recent available twelve months and dividing by 12. This information may be available in you library, or you may write to the Board of Governors, Publication Services Washington D.C. 20551. The most recent figure available 15 days prior to each Interest Rate Change Date will be the Current Index. If the new Index is no longer available, the Note Holder will choose an alternate Index which is based upon information comparable to the new Index. The Note Holder will give me notice as to this choice.

### (C) Interest Rate Change Calculation

Before each Change Date, the Note Holder will calculate my new interest rate by adding <u>Three & One-Tenth</u> percentage points <u>3.100</u> % ("Margin") to the Current Index. The Note Holder will then round the result of this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the limits stated in Section 4(D) below, this rounded amount will be my new interest rate until the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a new Margin will be determined. If a new Index is selected, the new Margin will be the difference between the average of the Index for the most recent three year period which ends on the last date the Index was available plus the then effective Margin and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). If an alternate Index is selected, the new Margin will be the difference between the average of the new Index for the most recent three year period which ends on that last date the new Index was available plus the then effective Margin and the average of the alternate Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). In either case, this difference will be rounded to the next higher 1/8 of 1%.

### (D) Interest Rate Limit

My interest rate will never be greater than   <u>Eleven & Ninety-Five-Hundredths</u> percentage points <u>11.950</u> % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

03-2383-003596059-0

**(E)  Payment Change Dates**
Effective  every  year  commencing                    May 1, 2001                        , and on
the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will
determine  the amount of the monthly payment  that would be sufficient to repay the projected
principal balance I am expected to owe as of the Payment Change Date in full on the maturity date
at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal
payments.  The result of this calculation is the new amount of my monthly payment, subject to
Section 4(F) below, and I will make payments in this new amount until the next Payment Change
Date unless my payments are changed earlier under Section 4(H) of this Note.

**(F)  Monthly Payment Limitations**
Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment,
beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I
have been paying.

**(G)    Changes  in  My  Unpaid  Principal  Due  to  Negative  Amortization  or  Accelerated
Amortization**
Since my payment amount changes less frequently than the interest rate and since the
monthly payment is subject to the payment limitations described in Section 4(F), my monthly
payment could be less or greater than the amount of the interest portion of the monthly payment
that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on
the maturity date in substantially equal payments.  For each month that the monthly payment is less
than the interest portion, the Note Holder will subtract the monthly payment from the amount of the
interest portion and will add the difference to my unpaid principal, and interest will accrue on the
amount of this difference at the current interest rate.  For each month that the  monthly payment is
greater than the interest portion, the Note Holder will apply the excess towards a principal reduction
of the Note.

**(H)  Limit on My Unpaid Principal; Increased Monthly Payment**
My unpaid principal can never exceed a maximum amount equal to    125%    of the principal
amount original borrowed.  In the event my unpaid principal would otherwise exceed that    125%
limitation, I  will begin  paying  a new monthly payment until the next Payment Change  Date
notwithstanding the 7 1/2% annual payment increase limitation.  The new monthly payment will be
an amount which would be sufficient to repay my then unpaid principal in full on the maturity date
at my interest rate in effect the month prior to the payment due  date in substantially equal
payments.

**(I)  Required Full Monthly Payment**
On the fifth anniversary of the due date of the first monthly payment, and on that same day
every fifth year thereafter, the monthly payment will be adjusted without regard to the payment cap
limitation in Section 4(F).

**(J)  Notice of Changes**
The Note Holder will deliver or mail to me a notice of any changes in the amount of my
monthly payment before the effective date of any change.  The notice will include information
required by law to be given me and also the title and telephone number of a person who will answer
any question I may have regarding the notice.

**(K)  Failure to Make Adjustments**
If for any reason Note Holder fails to make an adjustment to the interest rate or payment
amount as described in this Note, regardless of any notice requirement, I agree that Note Holder
may, upon discovery of such failure, then make the adjustment as if they had been made on time.  I
also agree not to hold Note Holder responsible for any damages to me which may result from Note
Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess
monies which I may have paid to partial prepayment of unpaid Principal.

**5.      BORROWER'S RIGHT TO PREPAY**
I have the right to make payments of principal at any time before they are due.  A payment
of principal only is known as a "prepayment".  When I make a prepayment, I will tell the Note
Holder in writing that I am doing so.

I may make a full prepayment or partial prepayments without payment of any prepayment
charge.  The Note Holder will apply all of my prepayments to reduce the amount of principal that I
owe under this Note.  If I make a partial prepayment, there will be no changes in the due dates of
my monthly payments unless the Note Holder agrees in writing to those changes.  My partial
prepayment may have the effect of reducing the amount of my monthly payments, but only after

32743 (02-99)                                           Page 3 of 6

03-2383-003596059-0

the first Payment Change Date following my partial prepayment. However, any reduction due to my partial prepayment may be offset by an interest rate increase.

**6.     LOAN CHARGES**

If a law, which applies to this loan and which sets maximum loan charges, is finally interpreted so that the interest or other loan charges collected or to be collected in connection with this loan exceed the permitted limits, then; (I) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (ii) any sums already collected from me which exceeded permitted limits will be refunded to me. The Note Holder may choose to make this refund by reducing the principal I owe under this Note or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment.

Miscellaneous Fees: I understand that the Note Holder will also charge a return item charge in the event a payment that I make in connection with repayment of this loan is not honored by the financial institution on which it is drawn. The current fee is $10.00. Lender reserves the right to change the fee from time to time without notice except as may be required by law.

**7.     BORROWER'S FAILURE TO PAY AS REQUIRED**

**(A)   Late Charges for Overdue Payments**

If the Note Holder has not received the full amount of any monthly payment by the end of <u>Fifteen</u> calendar days after the date it is due, I will pay a late charge to the Note Holder. The amount of the charge will be <u>5.000</u>% of my overdue payment of principal and interest. I will pay this late charge promptly but only once of each late payment.

**(B)   Default**

If I do not pay the full amount of each monthly payment on the date it is due, I will be in default.

**(C)   Notice of Default**

If I am in default, the Note Holder may send me a written notice telling me that if I do not pay the overdue amount by a certain date, the Note Holder may require me to pay immediately the full amount of principal which has not been paid and all the interest that I owe on that amount. That date must be at least 10 days after the date on which the notice is delivered or mailed to me (or, if the Federal National Mortgage Association or the Federal Home Loan Mortgage Corporation buys all or part of Lender's rights under the Security Instrument, in which case the notice will specify a date, not less than 30 days from the date the notice is given the Borrower).

**(D)   No Waiver By Note Holder**

Even if, at a time when I am in default, the Note Holder does not require me to pay immediately in full as described above, the Note Holder will still have the right to do so if I am in default at a later time.

**(E)   Payment of Note Holder's Costs and Expenses**

If the Note Holder has required me to pay immediately in full as described above, the Note Holder will have the right to be paid back by me for all of its costs and expenses in enforcing this Note, whether or not a lawsuit is brought, to the extent not prohibited by applicable law. Those expenses include, for example, reasonable attorneys' fees.

**8.     GIVING OF NOTICES**

Unless applicable law requires a different method, any notice that must be given to me under this Note will be given by delivering it or by mailing it by first class mail to me at the Property Address above or at a different address if I give the Note Holder a notice of my different address.

Any notice that must be given to the Note Holder under this Note will be given by mailing it by first class mail to the Note Holder at the address stated in Section 3(A) above or at a different address if I am given a notice of that different address.

**9.     OBLIGATIONS OF PERSONS UNDER THIS NOTE**

If more than one person signs this Note, each person is fully and personally obligated to keep all of the promises made in this Note, including the promise to pay the full amount owed. Any person who is a guarantor, surety, or endorser of this Note is also obligated to do these things. Any person who takes over these obligations, including the obligations of a guarantor, surety, or endorser of this Note, is also obligated to keep all of the promises made in this Note. The Note Holder may enforce its rights under this Note against each person individually or against all of us together. This means that any one of us may be required to pay all of the amounts owed under this Note.

32743 (02-99)                                               Page 4 of 6

03-2383-003596059-0

## 10.    WAIVERS
I and any other person who has obligations under this Note waive the rights of presentment and notice of dishonor. "Presentment" means the right to require the Note Holder to demand payment of amounts due. "Notice of dishonor" means the right to require the Note Holder to give notice to other persons that amounts due have not been paid.

## 11.    UNIFORM SECURED NOTE
This Note is a uniform instrument with limited variations in some jurisdictions.  In addition to the protections given to the Note Holder under this Note, a Mortgage, Deed of Trust or Security Deed ( the "Security Instrument"), dated the same date as this Note, protects the Note Holder from possible losses which might result if I do not keep the promises which I make in this Note.  That Security Instrument describes how and under what conditions I may be required to make immediate payment in full of all amounts I owe under this Note.  Some of those conditions are described as follows:

Transfer of the Property or a Beneficial Interest in Borrower.
If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person)  without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument.  However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) the request to assume is made after one  year following recordation of the Security Instrument, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; and (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Instrument or other obligations related to the  Note or other loan    document is acceptable to  Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption and Lender may increase the maximum rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer.  Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument.  Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written Assumption Agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration.  The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument.  If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

## 12.    MISCELLANEOUS PROVISIONS
In the event the Note Holder at any time discovers that this Note or the Security Instrument or any other document related to this loan, called collectively the "Loan Documents," contains an error which was caused by a clerical or ministerial mistake, calculation error, computer error, printing error or similar error (collectively "Errors"), I agree, upon notice from the Note Holder, to reexecute any Loan Documents that are necessary to correct any such Errors and I also agree that I will not hold the Note Holder responsible for any damage to me which may result from any such Errors.

If any of the Loan Documents are lost, stolen, mutilated or destroyed and the Note Holder delivers to me an indemnification in my favor, signed by the Note Holder, then I will sign and deliver to the Note Holder a Loan Document identical in form and content which will have the effect of the original for all purposes.

32743 (02-99)                              Page 5 of 6

03-2383-003596059-0

WITNESS THE HAND(S) AND SEAL(S) OF THE UNDERSIGNED.

X _____
RICHARD HOLT

Pay to the order of

Without Recourse
WASHINGTON MUTUAL BANK, FA

By _____
CYNTHIA RILEY
VICE PRESIDENT

32743 (02-99)                                    Page 6 of 6

 **Washington Mutual**

**NOTE ADDENDUM**
**Borrower's Payments Before They are Due**
**(Prepayment Fee Clause)**

03-2383-003596059-0

This Note Addendum is made this __22nd__ day of __March, 2000__ and is incorporated into and shall be deemed to amend and supplement the Note made by the undersigned (the "Borrower") in favor of __Washington Mutual Bank, FA__ (the "Lender") and dated as of even date herewith (the "Note").

This Note Addendum amends the provision in the Note regarding the Borrower's right to prepay as follows:

**BORROWER'S RIGHT TO PREPAY**

I have the right to make payments of principal before they are due. Any payment of principal only is known as a "prepayment." A prepayment of only part of the unpaid principal is known as a "partial prepayment."

If I make a full prepayment at any time during the first __Three__ years of the loan, I may be charged a fee as follows:

If Noteholder receives a prepayment on or before the first anniversary of the date of the first payment due date of the Note, the Prepayment Fee shall be equal to __Three__ percent ( __3.000__ %) of the original loan amount. If Noteholder receives prepayment after the first anniversary but on or before the __Second__ anniversary of the first payment due date of the Note, the prepayment fee shall be __Two__ percent ( __2.000__ %) of the original loan amount. If Noteholder receives prepayment after the second anniversary but on or before the __Third__ anniversary of the first payment due date of the Note, the prepayment fee shall be __One__ percent ( __1.000__ %) of the original loan amount. Thereafter, prepayment of the Note shall be permitted without any Prepayment Fee.

The Prepayment Fee shall be payable upon a full prepayment, voluntary or involuntary, including but not limited to a prepayment resulting from Noteholder's permitted acceleration of the balance due on the Note. Notwithstanding the foregoing, nothing herein shall restrict my right to prepay at anytime without penalty accrued but unpaid interest that has been added to Principal.

When I make a full or partial prepayment I will notify the Noteholder in writing that I am doing so. Any partial prepayment of principal shall be applied to interest accrued on the amount prepaid and then to the principal balance of the Note which shall not reduce the amount of monthly installments of principal and interest (until reamortized as set forth in the Note at the next Payment Change Date) nor relieve me of the obligation to make the installments each and every month until the Note is paid in full. Partial prepayments shall have no effect upon the due dates or the amounts of my monthly payments unless the Noteholder agrees in writing to such changes.

By signing below, borrower accepts and agrees to the terms and covenants contained in this Note Addendum.

X _____
RICHARD HOLT

(ASB/A410)
32890 (09-97)

Exhibit D

**VOL 3876 PG 250**          003822

PREPARED BY AND AFTER
RECORDING MAIL TO:

Washington Mutual Bank, FA
C/O DATA PLEX
12691 PALA DRIVE - MS156DPCA
GARDEN GROVE, CA 92841

─────────── SPACE ABOVE THIS LINE FOR RECORDING DATA ───────────

**Washington Mutual**                                    . 000000

## OPEN-END MORTGAGE

LOAN NO.: 03-2383-003596059-0

THIS MORTGAGE ("Security Instrument") is given on __March 22, 2000__ .
The mortgagor is __DORSUM LEMUS LIMITED LIABILITY COMPANY__

("Borrower"). This Security Instrument is given to __Washington Mutual Bank, FA__
_____ which is organized and existing under the
laws of __USA__ , and whose address is __400 East Main Street Stockton, CA__
__95290__ ("Lender"). Borrower owes Lender the principal sum of
__Three Hundred Eight Thousand & 00/100__

Dollars (U.S. __308,000.00__ ). This debt is evidenced by Borrower's note dated the same
date as this Security Instrument ("Note"), which provides for monthly payments, with the full
debt, if not paid earlier, due and payable on __April 1, 2030__ . This Security
Instrument secures to Lender: (a) the repayment of the debt evidenced by the Note, with
interest, and all renewals, extensions and modifications of the Note; (b) the payment of all other
sums, with interest, advanced under Paragraph 7 to protect the security of this Security
Instrument; and (c) the performance of Borrower's covenants and agreements under this
Security Instrument and the Note. For this purpose, Borrower in consideration of this debt does
hereby grant and convey to Lender and Lender's successors and assigns the following described
property located in __Fairfield__ County, Connecticut:

LEGAL DESCRIPTION ATTACHED HERETO AND MADE A PART HEREOF.

which has the address of __23 RIDGEWOOD DRIVE__
__NORWALK__ Connecticut __06853__ ("Property Address");
CONNECTICUT-Single Family-Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3007   9/90
73211A (12-97)                    Page 1 of 8

EXHIBIT D

VOL 3876 PG 251

LOAN NO.: 03-2383-003596059-0

TO HAVE AND TO HOLD this property unto Lender and Lender's successors and assigns, forever, together with all the improvements now or hereafter erected on the property, and all easements, appurtenances, and fixtures now or hereafter a part of the property. All replacements and additions shall also be covered by this Security Instrument. All of the foregoing is referred to in this Security Instrument as the "Property."

BORROWER COVENANTS that Borrower is lawfully seised of the estate hereby conveyed and has the right to mortgage, grant and convey the Property and that the Property is unencumbered, except for encumbrances of record. Borrower warrants and will defend generally the title to the Property against all claims and demands, subject to any encumbrances of record.

THIS SECURITY INSTRUMENT combines uniform covenants for national use and non-uniform covenants with limited variations by jurisdiction to constitute a uniform security instrument covering real property.

UNIFORM COVENANTS. Borrower and Lender covenant and agree as follows:

1. Payment of Principal and Interest; Prepayment and Late Charges. Borrower shall promptly pay when due the principal of and interest on the debt evidenced by the Note and any prepayment and late charges due under the Note.

2. Funds for Taxes and Insurance. Subject to applicable law or to a written waiver by Lender, Borrower shall pay to Lender on the day monthly payments are due under the Note, until the Note is paid in full, a sum ("Funds") for: (a) yearly taxes and assessments which may attain priority over this Security Instrument as a lien on the Property; (b) yearly leasehold payments or ground rents on the Property, if any; (c) yearly hazard or property insurance premiums; (d) yearly flood insurance premiums, if any; (e) yearly mortgage insurance premiums, if any; and (f) any sums payable by Borrower to Lender, in accordance with the provisions of Paragraph 8, in lieu of the payment of mortgage insurance premiums. These items are called "Escrow Items." Lender may, at any time, collect and hold Funds in an amount not to exceed the maximum amount a lender for a federally related mortgage loan may require for Borrower's escrow account under the federal Real Estate Settlement Procedures Act of 1974 as amended from time to time, 12 U.S.C. § 2601 et seq. ("RESPA"), unless another law that applies to the Funds sets a lesser amount. If so, Lender may, at any time, collect and hold Funds in an amount not to exceed the lesser amount. Lender may estimate the amount of Funds due on the basis of current data and reasonable estimates of expenditures of future Escrow Items or otherwise in accordance with applicable law.

The Funds shall be held in an institution whose deposits are insured by a federal agency, instrumentality, or entity (including Lender, if Lender is such an institution) or in any Federal Home Loan Bank. Lender shall apply the Funds to pay the Escrow Items. Lender may not charge Borrower for holding and applying the Funds, annually analyzing the escrow account, or verifying the Escrow Items, unless Lender pays Borrower interest on the Funds and applicable law permits Lender to make such a charge. However, Lender may require Borrower to pay a one-time charge for an independent real estate tax reporting service used by Lender in connection with this loan, unless applicable law provides otherwise. Unless an agreement is made or applicable law requires interest to be paid, Lender shall not be required to pay Borrower any interest or earnings on the Funds. Borrower and Lender may agree in writing, however, that interest shall be paid on the Funds. Lender shall give to Borrower, without charge, an annual accounting of the Funds, showing credits and debits to the Funds and the purpose for which each debit to the Funds was made. The Funds are pledged as additional security for all sums secured by this Security Instrument.

If the Funds held by Lender exceed the amounts permitted to be held by applicable law, Lender shall account to Borrower for the excess Funds in accordance with the requirements of applicable law. If the amount of the Funds held by Lender at any time is not sufficient to pay the Escrow Items when due, Lender may so notify Borrower in writing, and, in such case Borrower shall pay to Lender the amount necessary to make up the deficiency. Borrower shall make up the deficiency in no more than twelve monthly payments, at Lender's sole discretion.

Upon payment in full of all sums secured by this Security Instrument, Lender shall promptly refund to Borrower any Funds held by Lender. If, under Paragraph 21, Lender shall acquire or sell the Property, Lender, prior to the acquisition or sale of the Property, shall apply any Funds held by Lender at the time of acquisition or sale as a credit against the sums secured

733118 (12-97)                                    Page 2 of 9

VOL 3876 PG 252

LOAN NO.: 03-2383-003596059-0

by this Security Instrument.

3.   Application of Payments. Unless applicable law provides otherwise, all payments received by Lender under Paragraphs 1 and 2 shall be applied: first, to any prepayment charges due under the Note; second, to amounts payable under Paragraph 2; third, to interest due; fourth, to principal due; and last, to any late charges due under the Note.

4.   Charges; Liens. Borrower shall pay all taxes, assessments, charges, fines and impositions attributable to the Property which may attain priority over this Security Instrument, and leasehold payments or ground rents, if any. Borrower shall pay these obligations in the manner provided in Paragraph 2, or if not paid in that manner, Borrower shall pay them on time directly to the person owed payment. Borrower shall promptly furnish to Lender all notices of amounts to be paid under this paragraph. If Borrower makes these payments directly, Borrower shall promptly furnish to Lender receipts evidencing the payments.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender; (b) contests in good faith the lien by, or defends against enforcement of the lien in, legal proceedings which in the Lender's opinion operate to prevent the enforcement of the lien; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which may attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Borrower shall satisfy the lien or take one or more of the actions set forth above within 10 days of the giving of notice.

5.   Hazard or Property Insurance. Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage" and any other hazards, including floods or flooding, for which Lender requires insurance. This insurance shall be maintained in the amounts and for the periods that Lender requires. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's approval which shall not be unreasonably withheld. If Borrower fails to maintain coverage described above, Lender may, at Lender's option, obtain coverage to protect Lender's rights in the Property in accordance with Paragraph 7.

All insurance policies and renewals shall be acceptable to Lender and shall include a standard mortgage clause. Lender shall have the right to hold the policies and renewals. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.

Unless Lender and Borrower otherwise agree in writing, insurance proceeds shall be applied to restoration or repair of the Property damaged, if the restoration or repair is economically feasible and Lender's security is not lessened. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. If Borrower abandons the Property, or does not answer within 30 days a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may collect the insurance proceeds. Lender may use the proceeds to repair or restore the Property or to pay sums secured by this Security Instrument, whether or not then due. The 30-day period will begin when the notice is given.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amount of the payments. If under Paragraph 21 the Property is acquired by Lender, Borrower's right to any insurance policies and proceeds resulting from damage to the Property prior to the acquisition shall pass to Lender to the extent of the sums secured by this Security Instrument immediately prior to the acquisition.

6.   Occupancy, Preservation, Maintenance and Protection of the Property; Borrower's Loan Application; Leaseholds. Borrower shall occupy, establish, and use the Property as Borrower's principal residence within sixty days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender otherwise agrees in writing, which consent shall not be unreasonably withheld, or unless extenuating circumstances exist which are beyond Borrower's control. Borrower shall not destroy, damage or impair the Property, allow the

73211C (12-97)                                                        Page 3 of 8

VOL 3876 PG 253

LOAN NO.: 03-2383-003596059-0

Property to deteriorate, or commit waste on the Property. Borrower shall be in default if any forfeiture action or proceeding, whether civil or criminal, is begun that in Lender's good faith judgment could result in forfeiture of the Property or otherwise materially impair the lien created by this Security Instrument or Lender's security interest. Borrower may cure such a default and reinstate, as provided in Paragraph 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's good faith determination, precludes forfeiture of the Borrower's interest in the Property or other material impairment of the lien created by this Security Instrument or Lender's security interest. Borrower shall also be in default if Borrower, during the loan application process, gave materially false or inaccurate information or statements to Lender (or failed to provide Lender with any material information) in connection with the loan evidenced by the Note, including, but not limited to, representations concerning Borrower's occupancy of the Property as a principal residence. If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

7.     Protection of Lender's Rights in the Property. If Borrower fails to perform the covenants and agreements contained in this Security Instrument, or there is a legal proceeding that may significantly affect Lender's rights in the Property (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture or to enforce laws or regulations), then Lender may do and pay for whatever is necessary to protect the value of the Property and Lender's rights in the Property. Lender's actions may include paying any sums secured by a lien which has priority over this Security Instrument, appearing in court, paying reasonable attorneys' fees and entering on the Property to make repairs. Although Lender may take action under this Paragraph 7, Lender does not have to do so.

Any amounts disbursed by Lender under this Paragraph 7 shall become additional debt of Borrower secured by this Security Instrument. Unless Borrower and Lender agree to other terms of payment, these amounts shall bear interest from the date of disbursement at the Note rate and shall be payable, with interest, upon notice from Lender to Borrower requesting payment.

8.     Mortgage Insurance. If Lender required mortgage insurance as a condition of making the loan secured by this Security Instrument, Borrower shall pay the premiums required to maintain the mortgage insurance in effect. If, for any reason, the mortgage insurance coverage required by Lender lapses or ceases to be in effect, Borrower shall pay the premiums required to  obtain coverage substantially equivalent to the mortgage insurance previously in effect, at a cost substantially equivalent to the cost to Borrower of the mortgage insurance previously in effect, from an alternate mortgage insurer approved by Lender. If substantially equivalent mortgage insurance  coverage is not available, Borrower shall pay to Lender each month a sum equal to one-twelfth of the yearly mortgage insurance premium being paid by Borrower when the insurance coverage lapsed or ceased to be in effect. Lender will accept, use and retain these payments as a loss reserve in lieu of mortgage insurance. Loss reserve payments may no longer be required, at the option of Lender, if mortgage insurance coverage (in the amount and for the period that Lender required) provided by an insurer approved by Lender again becomes available and is obtained. Borrower shall pay the premiums required to maintain mortgage insurance in effect, or to provide a loss reserve, until the requirement for mortgage insurance ends in accordance with any written agreement between Borrower and Lender or applicable law.

9.     Inspection. Lender or its agent may make reasonable entries upon and inspections of the Property. Lender shall give Borrower notice at the time of or prior to an inspection specifying reasonable cause for the inspection.

10.    Condemnation. The proceeds of any award or claim for damages, direct or consequential, in connection with any condemnation or other taking of any part of the Property, or for conveyance in lieu of condemnation, are hereby assigned and shall be paid to Lender.

In the event of a total taking of the Property, the proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with any excess paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the taking, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by

73211D (12-97)                                                                 Page 4 of 8

VOL 3876 PG 254

LOAN NO.: 03-2383-003596059-0

the amount of the proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the taking, divided by (b) the fair market value of the Property immediately before the taking. Any balance shall be paid to Borrower. In the event of a partial taking of the Property in which the fair market value of the Property immediately before the taking is less than the amount of the sums secured immediately before the taking, unless Borrower and Lender otherwise agree in writing or unless applicable law otherwise provides, the proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the condemnor offers to make an award or settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the proceeds, at its option, either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due.

Unless Lender and Borrower otherwise agree in writing, any application of proceeds to principal shall not extend or postpone the due date of the monthly payments referred to in Paragraphs 1 and 2 or change the amount of such payments.

11. Borrower Not Released; Forbearance By Lender Not a Waiver. Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to any successor in interest of Borrower shall not operate to release the liability of the original Borrower or Borrower's successors in interest. Lender shall not be required to commence proceedings against any successor in interest or refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or Borrower's successors in interest. Any forbearance by Lender in exercising any right or remedy shall not be a waiver of or preclude the exercise of any right or remedy.

12. Successors and Assigns Bound; Joint and Several Liability; Co-signers. The covenants and agreements of this Security Instrument shall bind and benefit the successors and assigns of Lender and Borrower, subject to the provisions of Paragraph 17. Borrower's covenants and agreements shall be joint and several. Any Borrower who co-signs this Security Instrument but does not execute the Note: (a) is co-signing this Security Instrument only to mortgage, grant and convey that Borrower's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower may agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without that Borrower's consent.

13. Loan Charges. If the loan secured by this Security Instrument is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Note.

14. Notices. Any notice to Borrower provided for in this Security Instrument shall be given by delivering it or by mailing it by first class mail unless applicable law requires use of another method. The notice shall be directed to the Property Address or any other address Borrower designates by notice to Lender. Any notice to Lender shall be given by first class mail to Lender's address stated herein or any other address Lender designates by notice to Borrower. Any notice provided for in this Security Instrument shall be deemed to have been given to Borrower or Lender when given as provided in this paragraph.

15. Governing Law; Severability. This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. In the event that any provision or clause of this Security Instrument or the Note conflicts with applicable law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision. To this end the provisions of this Security Instrument and the Note are declared to be severable.

73211E (12-87)                                    Page 5 of 8

VOL 3876 PG 255

LOAN NO.: 03-2383-003596059-0

**16.  Borrower's Copy.** Borrower shall be given one conformed copy of the Note and of this Security Instrument.

**17.  Transfer of the Property or a Beneficial Interest in Borrower.** If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18.  Borrower's Right to Reinstate.** If Borrower meets certain conditions, Borrower shall have the right to have enforcement of this Security Instrument discontinued at any time prior to the earlier of: (a) 5 days (or such other period as applicable law may specify for reinstatement) before sale of the Property pursuant to any power of sale contained in this Security Instrument; or (b) entry of a judgment enforcing this Security Instrument. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees; and (d) takes such action as Lender may reasonably require to assure that the lien of this Security Instrument, Lender's rights in the Property and Borrower's obligation to pay the sums secured by this Security Instrument shall continue unchanged. Upon reinstatement by Borrower, this Security Instrument and the obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Paragraph 17.

**19.  Sale of Note; Change of Loan Servicer.** The Note or a partial interest in the Note (together with this Security Instrument) may be sold one or more times without prior notice to Borrower. A sale may result in a change in the entity (known as the "Loan Servicer") that collects monthly payments due under the Note and this Security Instrument. There also may be one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change in accordance with Paragraph 14 above and applicable law. The notice will state the name and address of the new Loan Servicer and the address to which payment should be made. The notice will also contain any other information required by applicable law.

**20.  Hazardous Substances.** Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property that is in violation of any Environmental Law. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property.

Borrower shall promptly give Lender written notice of any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge. If Borrower learns, or is notified by any governmental or regulatory authority, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law.

As used in this Paragraph 20, "Hazardous Substances" are those substances defined as toxic or hazardous substances by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials. As used in this Paragraph 20, "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection.

NON-UNIFORM COVENANTS. Borrower and Lender further covenant and agree as follows:

73211F (12-97)                                    Page 6 of 8

VOL 3876 PG 256

LOAN NO.: 03-2383-003596059-0

21. **Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Paragraph 17 unless applicable law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and foreclosure or sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to assert in court the non-existence of a default or any other defense of Borrower to acceleration and foreclosure or sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke any of the remedies permitted by applicable law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Paragraph 21, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

22. **Release.** Upon payment and discharge of all sums secured by this Security Instrument, this Security Instrument shall become null and void and Lender shall release this Security Instrument to Borrower. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only if the fee is paid to a third party for services rendered and the charging of the fee is permitted under applicable law.

23. **Waivers.** Borrower waives all rights of homestead exemption in, and statutory redemption of, the Property and all right of appraisement of the Property and relinquishes all rights of curtesy and dower in the Property.

24. **Riders to this Security Instrument.** If one or more riders are executed by Borrower and recorded together with this Security Instrument, the covenants and agreements of each such rider shall be incorporated into and shall amend and supplement the covenants and agreements of this Security Instrument as if the rider(s) were a part of this Security Instrument. [Check applicable line(s)]

| | | |
|---|---|---|
| [x] Adjustable Rate Rider | [ ] Condominium Rider | [ ] 1-4 Family Rider |
| [ ] Graduated Payment Rider | [ ] Planned Unit Development Rider | [ ] Biweekly Payment Rider |
| [ ] Balloon Rider | [ ] Rate Improvement Rider | [ ] Second Home Rider |
| [ ] Other(s) (specify) | | |

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any rider(s) executed by Borrower and recorded with it.

Signed, sealed and delivered in the presence of:

VOL 3876 PG 257

LOAN NO.: 03-2383-003596059-0

X _____
LARRY W. GOLDBERG          WITNESS

X _____
NATHAN S. KERLEN           WITNESS

X _____
RICHARD HOLT

_____ [Space Below This Line For Acknowledgment] _____

STATE OF CONNECTICUT, __GARFIELD__
County ss: __STAMFORD__

The foregoing instrument was acknowledged before me this __3/28/2000__
                                                              (date)
by __RICHARD HOLT__

_____
(person acknowledging)

(Official Seal)                    Commissioner of the Superior Court
                                   Notary Public—NATHAN S KERLEN

My Commission expires:

7321 1H (12-97)                    Page 8 of 8

VOL 3876 PG 258

## SCHEDULE A

ALL that certain lot of land, with the buildings thereon, situated in the City of
Norwalk in the County of Fairfield and State of Connecticut, known and
designated as lot number fifteen (15) on a certain map entitled "Map of
Dibblecrest at Rowayton, Norwalk, Ct.," now on file in the office of the Town
Clerk of said Norwalk and numbered twenty-two hundred and ninety-one
(2291), reference thereto being had; said lot being bounded as follows:

NORTHERLY:    60 feet, more or less, by land now or formerly of Alfred S.
Curry and Arline R. Curry;

EASTERLY:    175 feet, more or less, by land now or formerly of Alice D.
Nenhall and Dorothy Magyar;

SOUTHERLY:    60 feet, more or less, by Ridgewood Avenue; and

WESTERLY:    174 feet, more or less, by land now or formerly of
Arnold B. Aspblom and Gladys E. Aspblom.

VOL 3876 PG 259

 **Washington Mutual**

**ADJUSTABLE RATE RIDER**
**(FHLB Index - Payment and Rate Caps)**

03-2383-003596059-0

THIS ADJUSTABLE RATE RIDER is made this ___22nd___ day of
___March, 2000___, and is incorporated into and shall be deemed to amend and
supplement the Mortgage, Deed of Trust or Security Deed (the "Security Instrument") of the
same date given by the undersigned (the "Borrower") to secure Borrower's Adjustable Rate
Note (the "Note") to _____ Washington Mutual Bank, FA _____
(the "Lender") of the same date and covering the property described in the Security
Instrument and located at:

___23 RIDGEWOOD DRIVE, NORWALK, CT 06853___
(Property Address)

THIS RIDER CONTAINS PROVISIONS ALLOWING FOR CHANGES IN MY INTEREST
RATE AND MY MONTHLY PAYMENT. MY MONTHLY PAYMENT INCREASES WILL
HAVE LIMITS WHICH COULD RESULT IN THE PRINCIPAL AMOUNT I MUST REPAY
BEING LARGER THAN THE AMOUNT I ORIGINALLY BORROWED, BUT NOT MORE
THAN ___125%___ OF THE ORIGINAL AMOUNT (OR $ ___385,000.00___ ).
MY INTEREST RATE CAN NEVER EXCEED THE LIMIT STATED IN THE NOTE AND
RIDER. A BALLOON PAYMENT MAY BE DUE AT MATURITY.

ADDITIONAL COVENANTS. In addition to the covenants and agreements made in the
Security Instrument, Borrower and Lender further covenant and agree as follows:

**A.    INTEREST RATE AND MONTHLY PAYMENT CHANGES**
Interest will be charged on unpaid principal until the full amount has been paid. I will
pay interest at a yearly rate of ___4.950___ %. The interest rate I will pay will change in
accordance with Section 4 of the Note. The interest rate required by Section 2 and Section 4
of the Note is the rate I will pay both before and after any default described in Section 7(B) of
the Note.
The Note provides for changes in the interest rate and the monthly payments as follows:

32842 (02-99)                              Page 1 of 6

VOL 3876 PG 260

03-2383-003596059-0

4.   **INTEREST RATE AND MONTHLY PAYMENT CHANGES**
   (A)  Change Dates
   The   interest   rate   I   will   pay   may   further   change   on   the   first   day   of
_May, 2000_                               , and on that day every month thereafter. Each date
on which my interest rate could change is called a "Change Date".
   (B)  The Index
   Beginning with the first Change Date, my interest rate will be based on an Index. The
"Index" is  the  monthly weighted  average cost of  funds for  Eleventh  District  savings
institutions as announced by the Federal Home Loan Bank of San Francisco (the "11th District
Monthly Weighted Average Cost of Funds Index"). The most recent Index figure available on
each interest rate Change Date is called  the "Current Index".
   Information on the 11th District Monthly Weighted Average Cost of Funds Index may be
obtained by writing to the Federal Home Loan Bank at P.O. Box 7948, San Francisco,
California 94120, Attention: Public Information Department; or by calling the Federal Home
Loan Bank at 1-415-616-2600.
   If the Index is no longer available, the Note Holder will use the new Index as if it were
the Index. The new Index will be the Twelve-Month Average, determined as set forth below,
of the annual yields on actively traded United States Treasury Securities adjusted to a
constant maturity of one year as published by the Federal Reserve Board in the Federal
Reserve Statistical Release entitled "Selected Interest Rates (G.13)" (the "Monthly Yields").
The Twelve-Month Average is determined by adding together the Monthly Yields for the most
recent available twelve months and dividing by 12. This information may be available in you
library, or you may write to the Board of Governors, Publication Services Washington D.C.
20551. The most recent figure available 15 days prior to each Interest Rate Change Date will
be the Current Index. If the new Index is no longer available, the Note Holder will choose an
alternate Index which is based upon information comparable to the new Index. The Note
Holder will give me notice as to this choice.
   (C)  Interest Rate Change Calculation
   Before each Change Date, the Note Holder will calculate my new interest rate by adding
Three & One-Tenth                                            percentage points
3.100   % ("Margin") to the Current Index. The Note Holder will then round the result of
this addition to the nearest one-thousandth of one percentage point (0.001%). Subject to the
limits stated in Section 4(D) below,  this rounded amount will be my new interest rate until
the next Change Date. In the event a new Index is selected, pursuant to paragraph 4(B), a
new Margin will be determined.  If a new Index is selected, the new Margin will be the
difference between the average of the Index for the most recent three year period which ends

32842 (02-99)                               Page 2 of 6

VOL 3876 PG 261

03-2383-003596059-0

on the last date the Index was available plus the then effective Margin and the average of the new Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). If an alternate Index is selected, the new Margin will be the difference between the average of the new Index for the most recent three year period which ends on that last date the new Index was available plus the then effective Margin and the average of the alternate Index for the most recent three year period which ends on that date (or if not available for such three year period, for such time as it is available). In either case, this difference will be rounded to the next higher 1/8 of 1%.

(D)   Interest Rate Limit

My interest rate will never be greater than   11.950   % ("Cap"), except that following any sale or transfer of the property which secures repayment of this Note after the first interest rate Change Date, the maximum interest rate will be the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of such sale or transfer.

(E)   Payment Change Dates

Effective every year commencing   May 1, 2001   , and on the same date each twelfth month thereafter ("Payment Change Date"), the Note Holder will determine the amount of the monthly payment that would be sufficient to repay the projected principal balance I am expected to owe as of the Payment Change Date in full on the maturity date at the interest rate in effect 45 days prior to the Payment Change Date in substantially equal payments. The result of this calculation is the new amount of my monthly payment, subject to Section 4(F) below, and I will make payments in this new amount until the next Payment Change Date unless my payments are changed earlier under Section 4(H) of the Note.

(F)   Monthly Payment Limitations

Unless Section 4(H) and 4(I) below apply, the amount of my new monthly payment, beginning with a Payment Change Date, will be limited to 7 1/2% more or less than the amount I have been paying.

(G)   Changes In My Unpaid Principal Due to Negative Amortization or Accelerated Amortization

Since my payment amount changes less frequently than the interest rate and since the monthly payment is subject to the payment limitations described in Section 4(F), my monthly payment could be less or greater than the amount of the interest portion of the monthly payment that would be sufficient to repay the unpaid principal I owe at the monthly payment date in full on the maturity date in substantially equal payments. For each month that the

Page 3 of 6

33643 (02-99)

VOL 3876 PG 262

03-2383-003596059-0

monthly payment is less than the interest portion, the Note Holder will subtract the monthly payment from the amount of the interest portion and will add the difference to my unpaid principal, and interest will accrue on the amount of this difference at the current interest rate. For each month that the monthly payment is greater than the interest portion, the Note Holder will apply the excess towards a principal reduction of the Note.

(H)   Limit on My Unpaid Principal; Increased Monthly Payment

My unpaid principal can never exceed a maximum amount equal to ___125%___ of the principal amount original borrowed. In the event my unpaid principal would otherwise exceed that ___125%___ limitation, I will begin paying a new monthly payment until the next Payment Change Date notwithstanding the 7 1/2% annual payment increase limitation. The new monthly payment will be an amount which would be sufficient to repay my then unpaid principal in full on the maturity date at my interest rate in effect the month prior to the payment due date in substantially equal payments.

(I)   Required Full Monthly Payment

On the ___FIFTH___ anniversary of the due date of the first monthly payment, and on that same day every ___FIFTH___ year thereafter, the monthly payment will be adjusted without regard to the payment cap limitation in Section 4(F).

(J)   Notice of Changes

The Note Holder will deliver or mail to me a notice of any changes in the amount of my monthly payment before the effective date of any change. The notice will include information required by law to be given me and also the title and telephone number of a person who will answer any questions I may have regarding the notice.

(K)   Failure to Make Adjustments

If for any reason Note Holder fails to make an adjustment to the interest rate or payment amount as described in this Note, regardless of any notice requirement, I agree that Note Holder may, upon discovery of such failure, then make the adjustment as if they had been made on time. I also agree not to hold Note Holder responsible for any damages to me which may result from Note Holder's failure to make the adjustment and to let the Note Holder, at its option, apply any excess monies which I may have paid to partial prepayment of unpaid Principal."

B.   TRANSFER OF THE PROPERTY OR A BENEFICIAL INTEREST IN BORROWER
Covenant 17 of the Security Instrument is amended to read as follows:

Page 4 of 6

32642 (02-99)

VOL 3876 PG 263

03-2303-003596059-0

**Transfer of the Property or a Beneficial Interest in Borrower.**

If all or any part of the Property or any interest in it is sold or transferred (or if a beneficial interest in Borrower is sold or transferred and Borrower is not a natural person) without Lender's prior written consent, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if exercise is prohibited by federal law as of the date of this Security Instrument. Lender also shall not exercise this option if: (a) the request to assume is made after one year following recordation of the Deed of Trust, (b) Borrower causes to be submitted to Lender information required by Lender to evaluate the intended transferee as if a new loan were being made to the transferee; (c) Lender reasonably determines that Lender's security will not be impaired by the loan assumption and that the risk of a breach of any covenant or agreement in this Security Agreement or other obligations related to the Note or other loan document is acceptable to Lender, (d) Assuming party executes Assumption Agreement acceptable to Lender at its sole choice and discretion, which Agreement may include an increase to Cap as set forth below and (e) payment of Assumption Fee if requested by Lender.

To the extent permitted by applicable law, Lender may charge a reasonable fee as a condition to Lender's consent to the loan assumption, and Lender may increase the maximum interest rate limit to the higher of the Cap or 5 percentage points greater than the interest rate in effect at the time of the transfer. Lender may also require the transferee to sign an assumption agreement that is acceptable to Lender and that obligates the transferee to keep all the promises and agreements made in the Note and in this Security Instrument. Borrower will continue to be obligated under the Note and this Security Instrument unless Lender has entered into a written assumption agreement with transferee and formally releases Borrower.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is delivered or mailed within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

336A2 (02-99)

Page 8 of 8

VOL 3876 PG 264

03-2383-003596059-0

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute an document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

X _____
RICHARD HOLT

Page 6 of 6

22642 (03-99)

Received for Record   March 27,                A.D. 2000 at   9:31 A.   M.   and recorded by

Town Clerk

VOL 3876 PG 264

03-2383-003596059-0

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Adjustable Rate Rider. Borrower agrees to execute an document necessary to reform this Agreement to accurately reflect the terms of the Agreement between Borrower and Beneficiary or if the original Note, Trust Deed or other document is lost, mutilated or destroyed.

x _____
RICHARD HOLT

---

**STATE OF CONNECTICUT**
**COUNTY OF FAIRFIELD** } ss. **Town of Norwalk**

I, ___Deborah Troy, Asst._____, Town Clerk of the Town of Norwalk, keeper of the seal thereof and by law duly authorized to affix the same in authentication of the Records of said Town in my care and custody, DO HEREBY CERTIFY, That the above and foregoing is a true and correct transcript and copy of the original as appears in Volume ____3876_____ Page ___250 - 264_____ of the Norwalk Land Records.



IN WITNESS WHEREOF, I have hereunto subscribed my official signature and affixed the seal of said Town of Norwalk, this __6th__ day of ___November___ , A.D. 20 _08_

Town Clerk

Exhibit E

## CERTIFICATE OF LIMITED LIABILITY COMPANY RESOLUTION

The undersigned, being all of the members of Dorsum Nemus, LLC (the "LLC"), hereby confirm, resolve and consent to the following:

RESOLVED, that the LLC refinance and withdraw equity from the property known as 23 Ridgewood Road, Norwalk, CT. Said New mortgage shall be to Washington Mutual Bank, F.A. ("lender") in the amount of $308,000.00 in the form previously presented to the members, is hereby ratified, confirmed and approved; and it was

RESOLVED, that Richard Holt, acting as Manager, is hereby authorized to execute the Mortgage, Promissory Note, HUD-1 Settlement Statement, Title Affidavit and any documents, as required in connection with said refinance or as required by lender; and to take any further action and execute any and all further documents which may be required which may be necessary or desirable to carry this resolution into effect.

The undersigned further certify that the foregoing power and authorizations are not in conflict with any agreement to which the LLC is a party and shall continue in full force and effect.

Dated this __22nd__ day of __March__, 2000.

Richard Holt.    MANAGER,
DORSUM NEMUS, LLC

# EXHIBIT E

RETURN DATE: DECEMBER 30, 2008      :     SUPERIOR COURT

JPMORGAN CHASE BANK, NATIONAL     :     J.D. OF STAMFORD/NORWALK
ASSOCIATION

VS.      :     AT STAMFORD

HOLT, RICHARD L. A/K/A HOLT,      :     DECEMBER 12, 2008.
RICHARD, ET AL

## STATEMENT OF AMOUNT IN DEMAND

    The amount, legal interest or property in demand is $15,000.00 or more, exclusive of
interest and costs.

                                PLAINTIFF,
                                JPMORGAN CHASE BANK, NATIONAL
                                ASSOCIATION

                                David F. Borrino
                                Bendett & McHugh, P.C.
                                160 Farmington Avenue
                                Farmington, CT 06032
                                (860) 677-2868
                                Juris No. 102892

KMK/6076FC-200810180